1   Eric K. Fogderude, #070860
    FLETCHER & FOGDERUDE, INC.
2   A Professional Corporation
    5412 North Palm Avenue, Suite 101
3   Fresno, California 93704
    Telephone: (559) 431-9710
4   Facsimile: (559) 431-4108

5   Attorney for Defendant, DANIEL BOOBAR

6

7                IN THE UNITED STATES DISTRICT COURT FOR THE

8                     EASTERN DISTRICT OF CALIFORNIA

9

10

11  UNITED STATES OF AMERICA,     )   CASE NO. CR-F-02-5301 OWW
                                  )
12           Plaintiff,           )
                                  )   DEFENDANT DANIEL BOOBAR S
13  vs.                           )   SENTENCING MEMORANDUM AND
                                  )   FORMAL OBJECTIONS
    DANIEL BOOBAR,                )
14                                )   DATED: May 1, 2006
             Defendants.          )   TIME: 3:00 p.m.
15  _____)   COURT: Honorable Oliver W. Wanger

16

17       Daniel Boobar, by and through his Attorney, Eric K. Fogderude

18  submits the following as his objections to the Presentence Report.

19       Defendant Boobar submitted his informal objections to the

20  U.S. Probation Office and U.S. Attorney  s Office on March 30,

21  2006.  On April 18, 2006, Defendant Boobar received the U.S.

22  Probation Office response to his informal objections.

23       Defendant Boobar, incorporates by reference thereto, the

24  entire court file in this case, including trial transcripts,

25  motions, and pleadings, including, but not limited to Defendant

26  Boobar  s pending Motion To Dismiss or in the Alternative, Motion

27  for a New Trial, as well as the presentence investigator reports

28

1  and any formal objections and/or sentencing memorandums and oral

2  arguments related to the sentencing of co-defendants Emmerson,

3  Harland and Hariaczyi.

### I. INTRODUCTION

5      The Federal Courts once again have been authorized to

6  exercise judicial powers by evaluating all statutory factors

7  relevant to sentencing; instead of being restricted to just those

8  factors the Sentencing commission deemed permissible. On January

9  12, 2005, the Supreme Court issued its two-part decision in United

10 States v. Booker, 125 S.Ct. 738 (2005), holding that Blakely v.

11 Washington, 124 5.Ct.2531 (2004) applies to the Federal Sentencing

12 Guidelines such that the Sixth Amendments right to jury trial is

13 violated by increasing a sentence above the maximum based on

14 judicial findings of fact, and ruling unconstitutional certain

15 provisions of the Guidelines that make it mandatory for Federal

16 Judges to follow the Guidelines.  The majority decision held that

17 Guidelines violated the defendant  s Sixth Amendment right to a

18 jury trial because they require judges to find facts that increase

19 a sentence beyond the sentence that could be imposed based solely

20 on the jury  s verdict.

21     Under Booker the court held the mandatory *aspects* of the

22 Guidelines could be severed while preserving the overall statutory

23 scheme.  The Breyer majority in Booker held that 18 U.S.C.

24 3553(b)(1) (stating courts   shall impose a sentence.. within the

25 range  , set by the guidelines.) and 18 U.S.C. 3742(e) were

26 incompatible with today  s constitutional holdingand thus must be

27 excised from the Guidelines.  Booker, 2005 U.S. Lexis 628 at 28,

28

47.   Thus, the Feeney Amendment, otherwise known as the Protect Act, mandating *de novo* review of downward departures, is no longer in effect.   So modified,   the Court continued,   The Federal Sentencing Act...makes the guideline *effectively advisory*. It requires a sentencing court to consider the Guideline ranges (See, 18 U.S.C. 3553(a)4 (Supp.2004), but it permits the court to tailor the sentence in light of other statutory concerns as well. (See, 3553(a)(Supp.2004)) (emphasis added).

The exercise of judicial discretion is reviewed for reasonableness,   including determination based on factors that were considered   downward departures   under the Guideline before Booker.   Booker, 2005 U.S. Lexis 628 at 74-76.

It follows that, under Booker, courts must treat the Guidelines as just one of a number of sentencing factors.   Thus, the court is no longer required to essentially disregard relevant circumstances that fall within the broad categories identified by 18 U.S.C. section 3553(a) where they conflict with the previously mandatory Guidelines.  18 U.S.C. section 3553(a) states that sentencing courts   shall consider   apart from the Sentencing Guidelines, the following:

(1) the nature and circumstances of the offense and the history and character of the defendant;

(2) the need for the sentence to: (A) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; ( C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with

needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the need to avoid unwanted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and

(5) the need to provide restitution to any victims of the offense.  18 U.S.C. 3553(a).

Moreover, 3553(a) directs the court to   impose a sentence sufficient, but not greater than necessary, to comply with the purpose set forth in [3553(a)(2).  <u>Id</u>.

## II. BURDEN OF PROOF

Under the facts of the present case, where the consequences are serious and the evidence dubious or contested at best, the Court should use a reasonable doubt standard for fact-finding at sentencing.  Ninth Circuit law held before the decision in <u>United States v. Booker</u>, 125 S.Ct. 738 (2005). that the government bears the burden of proving guidelines enhancements (e.g., loss, drug weight, role, etc.) by at least a clear preponderance of reliable evidence.  <u>United States v. Mezas de Jesus</u>, 217 F.3d 638, 642-43 (9th Cir. 2000); <u>United States v.  Montano</u>, 250 F.3d 709, 713 (9th Cir. 2001).  The Sentencing Commission itself suggests that a bare preponderance - greater weight of credible evidence - is good enough. USSG § 6A1.3(a)(p.s.), commentary. As a   policy statement  , this was the only advice for the courts, not a binding rule.  Now, after <u>Booker</u>, the Commission s   policy statements   are only a factor for courts to   consider  .  18 U.S.C. § 3553(a)(5).

In this light, some courts have recently held that they will insist on a more stringent burden of proof, either beyond a reasonable doubt, or at the least, clear and convincing, even where the guideline are advisory.  See United States v. Malouf, 377 F.Supp.2d 315 (D.Mass. 2005); United States v. Munoz, 233 F.3d 1117, 1126-27 (9th Cir.2000) (the pre-Booker case held that clear and convincing evidence is required for relevant conduct that results in an offense level increase of more than four levels); United States v. Kikumura, 918 F.2d 1084, 1098-1102 (3d Cir. 1990) (requiring at least clear and convincing evidence for upward departure of five or more levels, based on finding of intent to kill, utilizing a due process balancing test); Kikumura II, 947 F.2d 72 (3d Cir.1991) (declining to address application of reasonable doubt standard because it was not raised on first appeal).

The Tenth Circuit has suggested that a district court may apply a burden of proof of beyond a reasonable doubt or, at least, a level of fact-skepticism beyond a mere preponderance.  See United States v. Dazey, 403 F.3d 1147, 1178 (10th Cir. 2005); United States v. Pimental, 367 F.Supp.2d 143 (D.Mass. 2005)(holding that Fifth Amendment requires application of the beyond a reasonable doubt standard to enhancements because each judicial finding of fact has  quantifiable consequences  on defendant s sentence); [accord]United States v. Coleman, 2005 WL 1226622, 6-7 (S.D. Ohio 2005); United States v. Kelley, 355 F.Supp.2d 1031 (D.Neb. 2005); United States v. Carvajal, 2005 WL 476125 (S.D.N.Y. 2005); United States v. Gray, 362 F.Supp.2d 714

1  (S.D.W.Va. 2005); United States v. Harper, 360 F.Supp.2d 833 (E.D.

2  Tex. 2005).

3       Judge Bataillon, of the United States District Court for the

4  District of Nebraska, last year issued a memorandum opinion

5  analyzing the impact of the Apprendi/Booker line of cases on the

6  question of the applicable burden of proof for findings that

7  increase the defendant s sentence under the advisory guidelines.

8  United States v. Huerta-Rodriguez, 355 F.Supp.2d 1019

9  (D.Neb.2005).  The court held that to comply with due process, it

10 would   require that a defendant is afforded procedural protections

11 under the Fifth and Sixth Amendments in connection with any facts

12 on which the government seeks to rely to increase a defendant  s

13 sentence.   Because the line separating a sentencing enhancement

14 fact from an element of the offense   remains blurred after

15 Booker,   the court determined to   err on the side of caution in

16 protecting a criminal defendant  s constitutional rights.   The

17 court wrote:

18          [T]he court will apply the same standard of proof
           to the factual showing that would be applied in reviewing
19         the sufficiency of the evidence to support the finding,
           or in conducting harmless error review on appeal, e.g.,
20         whether a reasonable juror could have found the fact beyond
           a reasonable doubt. [Citations and footnote omitted.]
21
           Whatever the constitutional limitations on the
22         advisory sentencing scheme, the court finds that it can
           never be   reasonable   to base any significant increase in
23         a defendant  s sentence on facts that have not been proved
           beyond a reasonable doubt.
24

25       See Huerta-Rodriguez, 355 F.Supp.2d at 20, citing Ring v.

26 Arizona, 536 U.S. 584, 592-93 and n.1 (200); Apprendi, 530 U.S. at

27 477; and Jones v. United States, 526 U.S. 227, 243 n. 6 (1999).

28

1   In a more recent decision, Judge Bataillon reiterated that the

2   Fifth Amendment required the court to use a standard of proof of

3   beyond a reasonable doubt. <u>United States v. Okai</u>, 2005 WL 2042301

4   (D.Neb. 2005).  The court noted that, while the remedial section

5   of the <u>Booker</u> decision concluded that there was no Sixth Amendment

6   violation if the guidelines were advisory, that decision did not

7   resolve the question of whether an increased sentence nonetheless

8   violated the Fifth Amendment.  2005 WL 2042301.  The court

9   reasoned that because a sentencing court s discretion remained

10   limited after <u>Booker</u>, constitutional safeguards attach to a

11   sentence at  the point which the sentence exceeds the limits

12   fixed by law.  (quoting<u>Apprendi v. New Jersey</u>, 530 U.S.466, 566

13   n. 9 (2000)).  Those limits are established by the defendant  s

14   plea or the jury verdict.

15       On the basis of these precedents, there is a solid foundation

16   for counsel to argue, in appropriate cases where the consequences

17   are serious or the evidence dubious, for the use of a reasonable

18   doubt standard for fact-finding at sentencing or, at least, a

19   standard of clear and convincing evidence.

20                **III. TRIAL AND POST TRIAL EVIDENCE SUMMARY**

21       The government contended at trial that Mr. Boobar entered

22   into a conspiracy with defendants Harland and Emmerson to sexually

23   exploit children by producing and/or distributing child

24   pornographic images via the internet.

25       Prior to the trial, both Emmerson and Harland became

26   cooperating government witnesses, participating in numerous

27   interviews with U.S. Customs and other government agents and both

28

1  had negotiated favorable plea agreements with the government.

2  **A. HARLAND S TRIAL TESTIMONY AND GOVERNMENT EXHIBITS 16.1 - 16.23**

3  At trial, the government introduced a series of pornographic

4  pictures taken by Harland of his daughter, which pictures were

5  located on Emmerson s computer in a file designated for Harland.

6  RT 1124-1126.  There was no forensic evidence showing whether

7  these photographs were ever transferred by Harland or Emmerson to

8  Boobar s computer or that Boobar ever received these pictures.

9  Boobar testified at trial he never received the photographs.

10  Harland testified at trial he took the photographs in series

11  16.0-16.23 at the request of Mr. Boobar, RT 1370:21-25, 1371:1-3,

12  that he did not place them on his website and that he sent them to

13  Mr. Boobar and Emmerson,  RT 1371-1376 and that Boobar knew about

14  and requested these photographs be sent to him.  RT 1371:16-18.

15  Harland testified that prior to trial he was interviewed four

16  times by the government and/or its agents, RT 1404 and that during

17  one of the interviews they showed him the series of photographs

18  16.1-16.23 and told him they retrieved them from Emmerson s

19  computer.  Harland testified that he sent those photographs to

20  Emmerson and Boobar. RT 1406-1409, 1410:20-22.  He further

21  testified that the only other person he sent them to was Paul

22  Whitmore.  RT 1422 17-21.

23  **B. HARLAND POST TRIAL DISCOVERY**

24  After the conclusion of the trial, the government was ordered

25  to provide sentence related discovery.  The government

26  subsequently disclosed over 100 hundred of U.S. Customs reports, a

27  CD disc, and a audio tape, which included Mr. Harland s taped

28

1  confession following his arrest by the U.S. Customs, the F.B.I.,

2  and it s multi-law enforcement agency task force.  The contents of

3  that discovery are the subject matter of a pending Motion to

4  Dismiss and/or Motion For a New Trial.

5      Harland s trial testimony is in direct conflict with

6  Harland s recently disclosed March 12,2002, interview in which he

7  stated he only sent those photographs to two (2) people, Emmerson

8  and Whitmore, that the idea for taking the photos was his idea,

9  and that they were the only persons who knew about these photos.

10 Transcript pp. 8-10, 14.

11 **HERBERT:** How old did you did you start taking pictures of your
   daughter?

12 **HARLAND:** I m really not one hundred percent certain, it was just a
   thing that seemed exciting at the time, I really don t know.

13 **HERBERT:** Was it somebody else s idea, you idea?

   **HARLAND:** Well, I d taken, as you do take photographs of family and

14 it just went I guess one stage too far. See Transcript p. 8

15 **HEBERT:** Just your daughter

   **HARLAND:** Yes

16 **HEBERT:** Did you ever trade these pictures on the internet?

   **HARLAND:** The ones of my daughter, yes

17 **HEBERT:** How about you and your daughter

   **HARLAND:** Uh, I did

18 **HEBERT:** Okay, do you know who you sent those to?

   **HARLAND:** Man out in California

19 **HEBERT:** Okay, do you know his name?

   **HARLAND:** Uh, Lloyd

20 **HEBERT:** Lloyd, anybody else?

   **HARLAND:** There was another man called Paul, and I don t know his

21 other name, I m still trying to think of his screen name, I know I
   was introduced to him by Lloyd, he was a friend of his

22 **HEBERT:** A friend of Lloyd s

   **HARLAND:** Yes

23 **HEBERT:** Do you know where Paul s at?

   **HARLAND:** I think he s in California

24 **HEBERT:** Did Paul and Lloyd send you pictures?

   **HARLAND:** Yes they did at one time

25 **HEBERT:** What kind of pictures did they send you

   **HARLAND:** The same kind. See Transcript pp. 9-10.

26

   **HEBERT:** Have you taken any other pictures other than the ones of

27 your daughter that we were looking at tonight of anybody under the
   age of eighteen?

28

**HARLAND:** No
**HEBERT:** Without their clothes on?
**HARLAND:** No
**HEBERT:** Has anybody else taken any pictures of your daughter without her clothes on?
**HARLAND:** No
**HEBERT:** Did anybody know about these pictures you were taking?
**HARLAND:** No
**HEBERT:** Other than Paul and Lloyd?
**HARLAND:** No
**HEBERT:** Paul and Lloyd know
**HARLAND:** That's correct
**HEBERT:** You sent them both pictures?
**HARLAND:** That's correct.  See Transcript p. 14.

The pictures shown to Harland during the interview appear to be the same ones which were contained on a CD disc forwarded by Clovis Police Department to U.S. Customs in West Palm Beach Florida, March 11, 2002, and which disc was provided as discovery on November 2, 2005.  That disc contains pictures introduced at trial as the government exhibit series 16.  The investigation subsequently established that Paul was co-defendant Paul Whitmore and Lloyd was co-defendant Lloyd Emmerson.

The statement of Harland at the time of his arrest was exculpatory evidence and critical to the defense in that it corroborated Mr. Boobar's defense that he never requested, received, or had knowledge of the series 16 photographs and it also impeached the government's star witness at trial, Mr. Harland as to the above stated facts and his other testimony.

### C.  EMMERSON'S TRIAL TESTIMONY AND GOVERNMENT EXHIBITS 1.1-1.28

At trial, the government contended that Emmerson had transmitted child pornographic images to Mr. Boobar via his computer, which images were received by Mr. Boobar via his computer.

The government relied on the testimony of Clovis Police

1   Officer Cassida, who testified that it was his opinion that the

2   photographs contained in government exhibit 1.1- 1.28 were

3   transferred from Emmerson s computer to Boobar s computer via file

4   transfer protocol.

5       The defense testimony of the defendant and computer forensic

6   expert, Dr. C. Stephen Carr, was to the contrary.

7       Although Emmerson was a cooperating government witness, the

8   government did not call him as a witness, so the defense did.

9   Emmerson s testimony corroborated Mr. Boobar s, in that he stated

10  he did not recall sending/placing series 1.1 - 1.28 in Boobar s

11  file, which would have made them accessible by Boobar.  He further

12  testified that he was careful to only put photographs in Boobar s

13  file that he knew Boobar wanted, which was clothed photos of girls

14  and fictional stories.

15      The government then attempted to impeach Emmerson by asking

16  if he drank alcohol in the past and whether he had a good

17  recollection of what he did back then.  See RT 1472-1486.

18                  **D.  EMMERSON POST TRIAL DISCOVERY**

19      After the conclusion of the trial, the government provided

20  discovery which included U.S. Customs reports which describe a

21  list provided by Emmerson in which he names those individuals who

22  were involved with Emmerson in the production and/or distribution

23  of child pornography, hereinafter, referred to as   Emmerson List #

24  1".  A redacted copy of   Emmerson List # 1" is attached as Exhibit

25  A.  The names have been redacted because the report may still

26  represent a continuing law enforcement investigation. Daniel

27  Boobar was not named on this list.

28

On March 8,2006, the government produced as additional discovery, what purports to be the   Emmerson List #2".  A copy of Emmerson List #2 and accompanying transmission letter is attached hereto as Exhibit B.  The defense contends, absent a denial by the government, that the Emmerson List # 2 was written by their cooperating witness, Mr. Emmerson and that this is the list referred to in the U.S. Customs report marked Exhibit A.

The recently discovered   Emmerson list #1   describes in detail those persons who were involved in child porn activities with Emmerson over the internet.  The list was provided to the government two (2) years prior to when Emmerson  s testified at trial.  The list provided their names and addresses and other indicia information, and confirmed that Mr. Emmerson will provide testimonial evidence against those individuals.  Although there still remains confusion by the government whether the actual list has been located by the government, it  s existence and contents are well described and documented in the recently disclosed U.S. Customs reports.

        ...To this day, it is unclear whether Emmerson actually wrote out a list of names and addresses of suspects or whether, more than likely, he provided investigators with indicia of addresses and supplemented it with verbal statements. What is clear, and what the parties appear to agree on, is Emmerson did provide law enforcement with information about several suspects after he was arrested and in approximately March 2002.   See Government  s Opposition to Defendant  s Motion to Dismiss at page 23, lines 19-25.

1  What is also clear and what the parties appear to agree on is

2  that Mr. Boobar was not named on either Emmerson List #1 or #2,

3  but eleven others were named.

4  These lists were exculpatory in nature and consistent with

5  Mr. Boobar s testimony and defense that he never produced,

6  requested or received Govt. exhibits 1.1 - 1.28 or any other child

7  pornographic pictures from Emmerson or Harland.

8  The lists were also relevant and material to rehabilitate the

9  testimony of Emmerson after the government impeached him as having

10  a bad memory, in that Emmerson had provided prior consistent

11  statements to government agents virtually since his arrest two

12  years earlier.  The favorable statement also reflected the

13  extensive reliance the government agents placed on his statement

14  as to other suspects.

15  **E. SUMMARY OF CONTESTED AND UNCONTESTED FACTS**

16  The following sentencing related facts have been

17  established at either the trial and/or in the post trial discovery

18  or in both, as follows:

19  1.  Mr. Boobar is not alleged to have conspired with any of

20  the nineteen co-defendants, other than Emmerson and Harland.

21  (Uncontested at trial) Whether Mr. Boobar criminally conspired

22  with Emmerson and/or Harland was contested at trial.

23  2.  No child pornographic images were found in Mr. Boobar s

24  home, personal property or computer. (Uncontested at trial)

25  3.  Mr. Boobar did not produce images of child pornography.

26  (Uncontested at trial)

27  4.  Mr. Boobar did not distribute child pornograpic images

28

1  via the internet to Emmerson, Harland, or anyone else.

2  (Uncontested at trial)

3      5.   Mr. Boobar did distribute non-pornographic images on

4  clothed children via the internet. (Uncontested at trial)

5      6.   Mr. Boobar did distribute non-criminal fictional stories

6  of sexual encounters between adults and children over the

7  internet. (Uncontested at trial)

8      7.   Mr. Boobar did engage in fantasy chats and role playing

9  with Harland regarding the fictional stories via the internet.

10  (Uncontested at trial)

11     8.   Mr. Boobar never requested or received from Harland via

12  the internet the pornographic pictures taken by Harland an

13  introduced at trial as Government Series 16.1 - 16.23. (Contested

14  at trial)

15     At trial, Harland testified he transmitted these images to

16  Boobar.  At trial Boobar denied receiving these images.  The

17  expert witnesses for the government and defense both testified

18  that there was no forensic scientific evidence to support

19  Harland s testimony.  The post-conviction discovery of Harland s

20  arrest-confession resulting from the U.S. Customs/FBI/multi-task

21  force investigation now confirms that Harland did not send these

22  images to Mr. Boobar and that Mr. Boobar did not know of these

23  images. See Boobar s Motion to Dismiss at pages 12-

24  13.  See Exhibit C, i.e. West Palm Beach Sheriff s Office report

25  at page 5 of 8.  See Exhibit 10 of Boobar s Motion to Dismiss i.e.

26  Transcript of Harland s confession on March 12, 2002.

27     9.   Mr. Boobar never requested or received from Emmerson the

28

1  child pornographic pictures introduced as Government Exhibits 1.1

2  - 1.28. (Contested at trial)

3      At trial the government's witness, Clovis Police Officer

4  Cassida testified that it was his opinion based upon an analysis

5  of Emmerson's computer that these images had been transferred via

6  the internet and received by Mr. Boobar.

7      The defense expert, Dr. C. Stephen Carr, testified to the

8  contrary.  Dr. Carr's qualifications include a Ph.D. in Electrical

9  Engineering and Computer Sciences and being one of 20 researchers

10 working on the <u>ARPA Net</u>, which was the foundation for the current

11 Internet.  A copy of Dr. Carr's curriculm vitae is attached hereto

12 as Exhibit D.  In addition, Mr. Boobar denied receipt of such

13 images and Mr. Emmerson, a cooperating government witness,

14 testified that he did not recall sending/placing such files in a

15 sub-file for Boobar's access.  Emmerson further testified that he

16 recalled Boobar being interested in pictures of clothed girls and

17 fictional stories, and these were the types of material that

18 Emmerson placed in the Boobar accessible sub-file.

19     The post-conviction discovery has now produced two

20 letters/lists prepared by Emmerson for the government shortly

21 after Emmerson's arrest in which Emmerson lists those individuals

22 he conspired with concerning child pornography.  That list does

23 not name Mr. Boobar or his screen name  loltot .

24                       **F. CONCLUSION**

25     As to the above-stated sentence related facts which were

26 contested at trial, i.e. Boobar's request for and/or receipt of

27 Govt. Exhibits 1.1-1.28 and 16.1 - 16.23, the government has

28

1  failed to meet its burden of proof under the beyond a reasonable

2  doubt standard, or by a clear and convincing evidence standard.

3  Therefore, these contested sentencing facts should not be

4  considered for purposes of proving guideline enhancements.

5  **IV. SPECIFIC OBJECTION TO PRESENTENCE REPORT**

6  **A.  The Offense Conduct, Paragraphs 12-17**

7  To the extent that the factual allegations contained in

8  paragraphs 12-17 represent a summary of the allegations set forth

9  in the superseding Indictment, no objections are made.

10  **B.  Boobar  s Specific Involvement, Paragraph 12-37**

11  1. Mr. Boobar moves the court to strike from the reports or

12  in the alternative find that the government has failed to meet its

13  burden of proof of any factual allegation that Mr. Boobar

14  requested the production of and/or received child pornographic

15  images from Emmerson and/or Harland.  Mr. Boobar incorporates by

16  reference, his summary of the trial and post-trial evidence

17  related to these factual disputes, set forth in paragraph III

18  hereinabove.

19  2.  Mr. Boobar moves to strike as being factual incorrect,

20  the last sentence of paragraph 37, which states that Emmerson

21  testified at trial that he allowed Boobar to transfer his computer

22  photographs of his daughter involved in sexually explicit

23  behavior.

24  Mr. Emmerson  s trial testimony was in fact to the contrary.

25  See trial transcript at page 1472-1486.

26  **V. VICTIM IMPACT, PARAGRAPHS 38-39**

27  A.  Mr. Boobar moves the court to strike the first sentence

28

of paragraph 38 which states that there were 37 known children who were identified as victims of the  overall conspiracy , on the grounds of lack of relevance and foundation.

The government did not contend nor was Mr. Boobar convicted of being involved in an  overall conspiracy  with the other nineteen co-defendants.  The government s theory at trial was that Mr. Boobar was involved in a conspiracy with co-defendants Emmerson and Harland, which involved images of the four (4) minors depicted in the governments exhibit series 1.1-1.28 and 16.1-16.23.

As set forth hereinabove, Mr. Boobar disputes the governments theory.

B.  Mr. Boobar moves the court to strike the last sentence of paragraph 39, concerning the opinion of an unidentified counselor as to when, if ever, Harland s daughter may manifest signs of abuse on the grounds that no discovery concerning this statement has been provided to the defense and on the grounds that it constitutes hearsay, speculation, and/or lacks sufficient foundation.

## VI.  OBSTRUCTION OF JUSTICE, PARAGRAPHS 40-43, 53

A.  Paragraph 40 accurately sets forth that a two (2) level increase in the offense level under USSG 3C1.1 is only warranted if it is established that the defendant committed perjury during the trial and Paragraphs 41 and 42 accurately summarizes Mr. Boobar s testimony at trial.

B. Mr. Boobar objects to conclusion and/or inference stated in paragraph 43 that because the jury rendered a guilty verdict,

Mr. Boobar must have committed perjury, and consequently a 2 level enhancement for obstruction of justice is warranted.

As set forth in Mr. Boobar s Motion For Dismissal and/or New Trial, the post jury trial discovery provided by the government corroborates Mr. Boobar s trial testimony that he did not ask for, receive or possess the child pornography photos from Harland or Emmerson and that he was not considered by Emmerson or Harland to be a conspirator of child pornography.  Had this evidence been presented to the jury, Mr. Boobar contends their verdict would have been different.

An enhancement under USSG 3C1.1 applies only when there has been a denial of guilt by the defendant under oath that constitutes perjury. See USSG 3C1.1 commentary, Application Note 2.

Application Note 2 further provides as follows:

> In applying this provision in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice.

For the above stated reasons the obstruction of justice enhancement does not apply.

## VII. GUIDELINE MANUEL USED, PARAGRAPH 46

_____The presentence report recommeds that the 2003 edition of the Guidelines Manuel be used.

The indictment alleges that between December 12, 1999 and January 26, 2002, that Defendant Boobar and other defendants conspired as charged.  See Presentence Investigation Report paragraph 12.

1    As set forth hereinabove, Defendant Boobar is requesting that

2  all evidence and testimony related to whether Defendant Boobar

3  received the images from Emmerson and Harland identified as

4  governments trial exhibit series 1.1 - 1.28 and 16.1-16.23,

5  respectively, not be considered for any sentencing purpose.

6    In the event the Court does grant Defendant Boobar s request,

7  the only remaining sentencing facts relate to the 1999 chat logs

8  and therefore the 1999 edition of the Guidelines Manuel should be

9  used.

10    **VIII. SPECIFIC OFFENSE CHARACTERISTICS, PARAGRAPH 48**

11    Mr. Boobar incorporates by reference his arguments set forth

12  in paragraph VI.

13    Because of the evidence was contested as to whether or not

14  Mr. Boobar received the images of Emmerson s and Harland s

15  daughters and because no evidence was introduced as to the age of

16  the  red-headed girl , it is impossible to determine from the

17  jury s verdict, whether the jury found beyond a reasonable doubt

18  that any child under the age of 12 was a victim for which Mr.

19  Boobar should be held accountable.

20    Therefore, the four (4) level increase should not be applied.

21    **IX. ADJUSTMENT FOR ROLE IN THE OFFENSE, PARAGRAPH 51**

22    Pursuant to USSG 3B1.2, if the defendant was a minimal

23  participant in any criminal activity, the offense level should be

24  decreased by 4 levels, and if the defendant was a minor

25  participant to the offense level should be reduced by 2 levels.

26  In cases falling between, a decrease of 3 levels is appropriate.

27    Application Note 4, provides that a minimal role in concerted

28

activity is intended to cover defendants who are plainly among the
least culpable of those involved in the conduct of a group.

Mr. Boobar s limited involvement with Emmerson and Harland
pales in comparison to Emmerson and Harland s involvement in the
general and as to all other co-defendants charged in the
Indictment.

Emmerson and Harland were sexual abusers of their own
children and they produced and distributed child pornography,
including images of their own children to as many as 20 defendants
charged in the instant indictment and others unnamed co-
conspirators.  Both possessed computer and/or CD files which
depicted hundreds of thousands of images of child pornography.

Mr. Boobar did not sexually abuse children, he did not
produce, distribute or possess images of child pornography, and he
was only involved with two of the co-defendants, i.e. Harland and
Emmerson.  In addition, both Harland and Emmerson acknowledged
that Mr. Boobar s conduct primarily focused upon the sharing of
clothed and legal pictures of girls, the sharing of fictional
stories and occasionally engaging in fantasy chats.  See
presentence report paragraphs 25, 26 and 34.

Mr. Boobar requests that the Court take judicial notice of
the presentence investigative reports of co-defendants Hariaczyi,
Harland and Emmerson concerning the nature and extent of their
criminal conduct, as well as all other co-defendants charged in
this indictment.

Mr. Boobar requests that a copy of co-defendants Hariaczyi.
Harland and Emmerson presentence investigation reports also be

1  attached as defense exhibits, for purposes of Mr. Boobar s

2  sentencing hearing.

3      For the above stated reasons, Mr. Boobar is entitled to a 4

4  level reduction under the guidelines for his minimal participation

5  in the criminal conspiracy alleged in the indictment.

6  **X. MULTIPLE COUNT ADJUSTMENT, PARAGRAPHS 55-60**

7      Mr. Boobar incorporates his arguments set forth in paragraphs

8  III and V.

9      The jury was not asked to decide the number of victims, if

10  any, and it can not be determined from the verdict rendered

11  whether the jury determined beyond a reasonable doubt whether

12  there were one or more victims.

13      For the above stated reasons, a multiple count increase

14  should not be applied.

15  **XI.  ACCEPTANCE OF RESPONSIBILITY, PARAGRAPH 63**

16      Mr. Boobar as repeatedly expressed remorse and regret for the

17  conduct he engaged in which resulted in his conviction.  His

18  statement is confirmed in paragraph 44 of the probation report and

19  in his letter submitted to the court.  During the trial, Mr.

20  Boobar testified truthfully, acknowledging his communications with

21  Emmerson and Harland, including the communication of fictional

22  accounts of incestuous sexual encounters between adult males and

23  underage females, and the engaging in fantasy chat and role

24  playing sessions and the exchanging of images of underage

25  children, such as alleged in overt act 2M of the Indictment.

26      Mr. Boobar also expressed remorse for his conduct when he

27  testified at trial.

28

1   The fact that Boobar testified at trial does not preclude him
2   from receiving a 2 level reduction for acceptance of
3   responsibility.  Where a defendant goes to trial to make a
4   challenge to the applicability of a statute to his conduct, he may
5   still receive the 2 level adjustment (See USSG 3 Elolir
6   Commentary, Application Note 2).

7   Mr. Boobar  s defense was that although he engaged in fantasy
8   fictional chats of a sexual nature concerning children, and
9   distributed provocative pictures of clothed children, and
10  distributed fictional stories of minors being sexually exploited,
11  the chats, pictures and stories he shared represented
12  constitutional protected speech.  Numerous examples of these
13  materials were moved into evidence as Defense Exhibits.  The
14  jury was then asked to determine whether Mr. Boobar  s conduct
15  violated the statute.

16  For the above stated reasons, Mr. Boobar is entitled to a 2
17  level reduction under the guidelines for his acceptance of
18  responsibility.

19  **XII. OFFENSE LEVEL AND GUIDELINE RANGE, PARAGRAPHS 64 AND 91**

20  For the reasons set forth hereinabove, the offense level
21  should be the base offense level 27.  The U.S.S.G. sentencing
22  range for a criminal history level 1 and offense level of 27 is
23  70-87 months.

24  The recommendation set forth in the presentence report on
25  page 20 is for a sentence in the middle of the guideline range,
26  which would be 78-79 months.

27  For the reasons set forth hereinabove under departures, a

28

1   sentence at the bottom of the guideline is appropriate, and would

2   result in a sentence of 78 months.

3   **XIII. DOWNWARD DEPARTURES 18 USC 3553(a),PARAGRAPH 95**

4       A.  Mr. Boobar is entitled to a downward departure pursuant

5   to USSG 3B 1.2 (a) in that the co-defendants role , the offense as

6   set forth hereinabove in paragraph VIII, was that a minimal

7   participant.

8       Chapter 1, Pt. A(4)(b) of the United States Sentencing

9   Guidelines describes the concept of a  heartland  in the

10  introduction. The United States Sentencing Commission intends the

11  sentencing courts to treat each guideline as carving out a

12   heartland , a set of typical cases embodying the conduct that

13  each guideline describes.  When a court finds an atypical case,

14  one to which a particular guideline linguistically applies, but

15  where conduct significantly differs from the norm, the court may

16  consider whether a departure is warranted.

17      In <u>United States v. Stevens</u>, 197F.3d 1263 (9th Cir. 1999), the

18  court held that the District Court must base it  s determination on

19  the nature of the defendant  s conduct in comparison with the

20  conduct of the other offenders of the same statute, and that the

21   heartland  to be determined is the heartland of the offense of

22  possession child pornography. <u>Id</u>. At 1268-1269.

23      In <u>United States v. Parrish</u>, 308 F.3d 1025, 1030 (9th Cir.

24  2002), Parrish  s conduct was compared with the conduct of a

25   typical  offender under this statute.  The defendant  s expert

26  witness and the court concluded that Parrish  s conduct was

27  significantly less serious than that of offenders in other cases

28

1 involving possession of child pornography.  Parrish  s activity was

2   pretty minor   compared to the content of images possessed by

3 other offenders.  His conduct was   on the minimal end   of the

4 scale, when compared to the conduct of a typical child pornography

5 offender.

6   The evidence in this case is quite clear that Mr. Boobar  s

7 conduct as compared to the other offenders is significantly less

8 serious.  His conduct is   on the minimal end   of the scale when

9 compared to the conduct of a typical child pornography offender.

10   B.  Mr. Boobar Should receive a downward departure to avoid

11 unwanted sentencing disparities. 18 USC section 3553(a) states

12 that the sentencing courts   shall consider   apart from the

13 Sentencing Guidelines, the following:...

14         (4) the need to avoid unwanted sentencing disparities
          among defendants with similar records who have been
15        found guilty of similar conduct.....

16   Co-defendant Trent Hariaczyi, was charged in the Superseding

17 Indictment, along with Mr. Boobar, and others, with conspiracy to

18 sexually exploit minors.  See presentence report page 1b and

19 superceding indictment.

20   On November 21, 2005, he was allowed to plead to a lesser

21 offense of possession of visual depictions of sexual exploitation

22 of a minor under 18 USC 2252(a)(4).

23   On March 7, 2006, Mr. Hariaczyi was sentenced to 21 months in

24 prison.  See Judgment filed March 8, 2006, Clerk  s document 491.

25   A review of the governments sentencing memorandum of

26 Hariaczyi  s sentencing filed March 3, 2006, shows that his

27 participation in the conspiracy was substantially greater and more

28

1   involved than Mr. Boobars.  See Clerk s document 486.

2       Attachment 1 to the governments sentencing brief, was a

3   declaration of the government s chief investigating officer, Mike

4   Cassida.  That declaration set forth the following facts

5   concerning Mr. Hariaczyi s relevant conduct in the Conspiracy

6   charged in the Superceding Indictment and Hamlet investigation. A

7   copy of that declaration is attached hereto as Exhibit E.

8       Mr. Hariaczyi talked about hiring an age 11-12 year old model

9   for the purpose of taking her picture, including pictures without

10  panties, Exhibit E at page 3; the encryption of pornographic CD s

11  and the daily exchange of files between co-defendant Bowcut and

12  Harland, Exhibit at page 4 & 5; Hariaczyi s receipt of one CD

13  which contained almost 700 MB of child pornography pictures and

14  videos, Exhibit E at page 5:10-14; Hariaczyi s receipt of images

15  of Bowcut s minor daughter, Exhibit E at page 5:15-24; Hariaczyi s

16  request of special pornographic pictures of  Amanda , who was the

17  daughter of co-conspirator John Zill, Exhibit E at page 6:20-27.

18  Mr. Cassida confirms that Mr. Hariaczyi was a minor participant in

19  this conspiracy. Exhibit E at page 7:8-9.

20      Mr. Boobars involvement in the conspiracy is even less than

21  that of Mr. Hariaczyi.  The government contended Boobar received

22  approximately 50 pornographic images from co-defendant Emmerson

23  and Harland, whereas Hariaczyi received 700 MB of child

24  pornographic images and videos from co-defendant Zill and

25  Bowcut.  Boober did not produce or send child pornography, but

26  Hariaczyi did.  Boobar voluntarily withdrew from the conspiracy

27  and Hariaczyi did not.  In order to avoid sentencing disparities

28

1  among defendants with similar records for similar conduct, the

2  court should depart and sentence Mr. Boobar to 23 months or the

3  lowest level allowed by law.

4      The government confirms in its opposition brief to

5  defendant s motion to dismiss, that Hariaczyi was one of eleven

6  suspects identified as being a producer of images of child

7  exploitation and a member of the conspiracy charged, but the

8  government opted to allow Hariaczyi to plead to a different charge

9  thereby resulting in his 23 month sentence.  See Government s

10  Opposition to Defendant s Motion to Dismiss at page 25, lines 6-13

11  and footnote 3.  The government is charged with promoting equal

12  justice for all, including those it prosecutes for criminal

13  conduct.  As such, the government should allow Mr. Boobar, whose

14  conduct was less egregious than Mr. Hariaczyi s, to plead to the

15  same charge and receive a comparable sentence.

16      If the government makes such an offer, Mr. Boobar will accept

17  the offer and withdraw his pending motion.

18      C. Mr. Boobar should receive a downward departure due

19  to his unusual susceptibility to abuse while in prison.

20      During the trial, the Court had the opportunity to observe

21  Mr. Boobar s appearance, demeanor and stature.

22      As noted in the presentence report, Mr. Boobar is a 39 year

23  old male who has no prior juvenile or adult convictions.  Prior to

24  his remand into custody at the Fresno County Jail following his

25  conviction, he had never before seen the inside of a jail or

26  prison cell.  For all practical purposes he is unsophisticated or

27  naive as to rigors of prison confinement. Consequently, Mr. Boobar

28

1  has an unusually high risk for being physically abused within the

2  prison system.  He is quite a gentle, appealing, thin, frail,

3  young man of fair complexion with an esthetic and sensitive look

4  about him.  His personality is spiritual, non-aggressive, and non-

5  assertive.

6      Pursuant to U.S.S.G. § 5H1.3, 5H1.4, the factors of physical,

7  mental, and emotional condition are not ordinarily relevant in

8  determining whether a sentence should be outside the guidelines.

9  However, in U.S. v. Lara, the district court did not abuse its

10 discretion in downwardly departing from the Guidelines   range

11 pursuant to § 3553(b).  905 F.2d 599, 606 (2d Cir. 1990)

12 (superseded by statute as stated in <u>Koon v. U.S.</u>, 518 U.S. 81

13 (1996)).  In finding that the defendant was particularly vulnerable

14 to victimization, the court considered the defendant  s fragility,

15 sexual orientation and immature appearance.  Moreover, the court

16 granted the departure for the defendant  s extreme vulnerability in

17 light of the added burdens of incarceration that the defendant

18 faced compared to those not standing in the defendant  s shoes.<u>Id</u>.

19 at 604.  The court further stated that   [e]xtreme vulnerability of

20 criminal defendants is a factor that was not adequately considered

21 by the Commission and a proper ground for departure under §§ 3553

22 (b).  <u>Id</u>. at 606.

23      Due to Mr. Boobar  s youthful appearance, naivety, and passive

24 demeanor, he is extraordinarily susceptible and vulnerable to

25 victimization in the prison environment.  Moreover, Mr. Boobar  s

26 complete lack of any prior incarceration or criminal history

27 exposes him as a target for abuse by other inmates. Thus, because

28

1   Mr. Boobar will be subject to victimization, which is an

2   additional burden of incarceration that he faces compared to other

3   defendant  s not standing in his shoes, the Defense respectfully

4   urges this Court to depart accordingly.

5      In a very similar situation, the Defendant in <u>United States</u>

6   <u>v. Parrish</u>, 308 F.3d 1025, 1031, (attached as Exhibit C)was found

7   susceptible to abuse in prison because of a   combination   of

8   factors which included:   his stature, his demeanor, his naivetè,

9   [and] the nature of the offense.

10      The exact situation applies in this instance in that Daniel

11   Boobar is a <u>gentle, appealing, thin, frail young man of fair</u>

12   <u>complexion with an esthetic and sensitive look </u>about him.

13   <u>His personality is spiritual non-agressive, and non-assertive</u>.

14      Based upon Mr. Boobar  s characteristics, it is abundantly

15   clear that he is <u>highly</u> susceptible to abuse in prison and should

16   be given a downward departure to avoid prison confinement to the

17   maximum extent allowed by law.

18      D.  Mr. Boobar should receive a downward departure because

19   his participation in the instant case constituted aberrant

20   behavior.  18 USC section 3553(a) states that sentencing courts

21    shall consider   apart from the Sentencing Guidelines, the

22   following: (1) the nature and circumstances of the offense and the

23   history and character of the defendant.

24      Mr. Boobar  s participation in the instant offense, although

25   minimal, departed substantially from his normal behavior.

26   U.S.S.G. § 5K2.20 states, in part, that the Court may depart

27   downward under this policy statement only if the defendant

28

1    committed a single criminal occurrence or single criminal

2    transaction without significant planning.  In U.S. v. Fairless,

3    the defendant received a downward departure from 30-60 months for

4    a bank robbery charge in part because his actions constituted

5    aberrant behavior.  975 F.2d 664 (9th Cir. 1992).  In U.S. v.

6    Vieke, defendant was granted a four level downward departure to

7    probation in a credit card fraud case where the crime was   totally

8    out of suit with the rest of her life and the behaviors[,]   even

9    though the fraud went on for years.  348 F.3d 811 (9th Cir. 2003).

10        To qualify for departure according to aberrant behavior, a

11   defendant  s conduct must represent a marked deviation from an

12   otherwise law-abiding life and is unavailable if the (1) offense

13   involved serious bodily injury or death; (2) use or discharge of a

14   firearm; (3) a serious drug-trafficking crime; or (4) the

15   defendant has more than one criminal history point. Mr. Boobar  s

16   involvement in the present offense appears

17   to be an act of aberrant behavior as described under U.S.S.G. §

18   5K2.20.

19        As documented in the reports, is 39 year old who is the

20   product of a family described as being close and supportive.  His

21   parents have been married 45 years, Mr. Boobar and his wife,

22   Christina have been married for 13 years and they have maintained

23   a good and strong marriage.  The Boobar  s have two children ages

24   eight and five, who dearly miss their father.  Mr. Boobar earned

25   a bachelor  s degree in business administration and economics and a

26   masters degree in business administration.  He and his wife both

27   maintained business careers and he had no prior criminal history.

28

1    Mr. Boobar was arrested on the present charge on November 1,

2    2002, and was released on December 4, 2002, on stringent

3    conditions which required his living with his parents, but

4    allowing supervised visits with his children.

5    On March 31, 2003, because of what is described in the

6    presentence report at paragraph 9 as  extremely compliant behavior

7    with the strict orders of his release  , he was allowed to return

8    to his family in Houston.

9    The report also described in paragraph 10 that during the

10   ensuing 14 months, the defendant was described as a  compliant and

11   model defendant  .  Mr. Boobar was remanded to custody on May 6,

12   2004, following being found guilty.

13   Mr. Boobar meets all the criteria for departure in accordance

14   with his aberrant behavior.  He played a minor, peripheral role in

15   the present offense, which greatly deviated from his normal course

16   of conduct.

17   Mr. Boobar asserts that the instant offense greatly deviates

18   from his usual conduct, as exemplified by his commendable work

19   ethic, mitigating role in the present offense, acknowledgment of

20   remorse and lack of an exceptional criminal history.  Thus, the

21   defense respectfully requests that this Court consider that Mr.

22   Boobar  s involvement in the present offense constituted aberrant

23   behavior in fashioning his sentence.

24   E. Mr. Boobar  s Young Age, Employment History and Current

25   Stable Employment Justifies Further Downward Departure.

26   Mr. Boobar has maintained stable and gainful employment

27   throughout his adult life.  See U.S. v. Bigcrow, 898 F.2d 1326,

28

1331 (8th Cir. 1990) (excellent employment record); <u>United States v. Shoupe</u>, 988 F.2d 440 (3d Cir. 1992) (age and immaturity considered in whether criminal history overstates propensity); <u>U.S. v. Jones</u>, 158 F.3d 492 (10th Cir. 1998) (where defendants pled guilty to possession of a firearm by a prohibited person, the district court did not abuse its discretion in departing downward by three levels where, as one of the eleven factors, it considered the defendant s  long impressive work history...where jobs are scarce.  );<u>U.S. v. Alba</u>, 933 F.2d 1117 (2d Cir. 1991) (longstanding employment at two jobs); <u>U.S. v. Jogmohan</u>, 909 F.2d 61 (2d Cir. 1990) (exceptional employment history and nature of the crime.)

Although age is not ordinarily relevant in determining a defendant s sentence, pursuant to U.S.S.G. § 5H1.1, age may be considered in unusual cases in combination with other factors. See <u>U.S. v. Hildebrand</u>, 152 F.3d 756 (8th Cir. 1998).

In <u>United States v. Higgins</u>, the court stated that a defendant s young age and stable employment will justify a downward departure if extraordinary.  967 F.2d 841 (3d Cir. 1992).

At the time of his initial involvement in this case, Mr. Boobar was in his early 30's and had extraordinary work ethic and work history dating back to his graduation from high school.  Mr. Boobar has always approached his employment pursuits maturely and responsibly.  As noted in the presentence report in paragraphs 80-86, since 1992 Mr. Boobar has owned and operated a shopping cart business which had two employees and in 1998 he owned and operated a second business where he sold palm pilots and trained palm pilot

1   users.  From 1989 until 1994, the defendant was employed by the

2   Ramada Plaza Hotel where he worked as a bar manager and food and

3   beverage director before forming his own business.

4       Mr. Boobar is an independent and self-sufficient business

5   man.  He has maintained gainful and steady employment throughout

6   his adult life.  In the present case, predicated upon his relative

7   young age, ambition, exceptional commitment to his employment, and

8   lack of entanglement with the criminal justice system, these

9   factors collectively justify further downward departure.

10      F.  Totality of Circumstances Warrants a Downward Departure.

11      The Ninth Circuit has long held that a  combination of

12   factors  can together constitute a mitigating circumstance

13   justifying departure.  See United States v. Cook, 938 F.2d 149 (9th

14   Cir. 1991).  In Cook, the Court explained that  [t]here was no

15   reason to be so literal minded as to hold that a combination of

16   factors cannot together constitute a  mitigating circumstance.

17   Id. at 153; see also U.S.S.G. § 5K2.0, Grounds for Departure

18   (acknowledging circumstances that warrant departure may not be

19   listed in Guideline).  The above factors, when viewed in the

20   aggregate, support a downward departure of Mr. Boobar  s sentence.

21   Mr. Boobar therefore respectfully requests that this Court

22   consider the above factors in their totality as well as

23   individually when determining departure.

24      One district court has observed that the statutory madate to

25   consider  the kinds of sentences available  under 18 U.S.C. § 3553

26   (a)(3) is  rarely mentioned in the sentencing courts.  United

27   States v. Guiro, 887 F.Supp. 66, 68 (E.D.N.Y. 1995).  While the

28

1   choices are many in theory, they may be fewer in practice.  Id.

2   (internal citations omitted).  The Guidelines  do not displace the

3   traditional role of the district court in bringing compassion and

4   common sense to the sentencing process. ... In areas where the

5   Sentencing Commission has not spoken... district courts should not

6   hesitate to use their discretion in devising sentences that

7   provide individualized justice.  United States v. Williams, 65

8   F.3d 301, 309-310 (2nd Cir. 1995).

9       Mr. Boobar respectfully urges this Court to exercise its

10  discretion and grant the requested departure based upon the

11  compelling combination of circumstances that his case presents.

12  Courts are authorized to depart downward when the combination of

13  factors indicate departure is appropriate.  938 F.2d 149 (9th Cir.

14  1991).

15      The defense requests a downward departure on behalf of Mr.

16  Boobar to allow for a sentence no greater than that received by

17  co-defendant Hariaczyi or as low as permitted by law.

18           **XIV. JUSTIFICATION, PARAGRAPH 99**

19      The presentence investigation report recommends that as a

20  condition of supervised release that Mr. Boobar register as a sex

21  offender and that he be prohibited from having contact with

22  children under age 18.

23      Mr. Boobar objects to the restriction prohibiting contact

24  with his own children as it is more restrictive than the

25  conditions of his pre-trial release.  Mr. Boobar was allowed to

26  reside with his wife and two minor children from March 2003 until

27  May 2004, during which time he was described as extremely

28

1  compliant and a model defendant.  The allegation against Mr.
2  Boobar was not that he molested any children or created any child
3  pornography, but rather he received such images from others.

4      Mr. Boobar requests the same conditions carry over to
5  supervised release, i.e. supervised contact with his own children.

6      Mr. Boobar objects to the mandatory requirement that he
7  register as a sex offender.  The statute of conviction does not
8  require registration and it is uncertain where Mr. Boobar will
9  reside when released.  Mr. Boobar requests that he be ordered to
10 obey all laws.  In the event he resides in a state which requires
11 registration for this conviction, he of course would be required
12 to comply with that law.

13     Similar requests were raised on behalf of Mr. Hariaczyi at
14 his sentencing, and granted by the Court.  See Hariaczyi s
15 Judgment In A Criminal Case at document 491, pages 4 and 5.

**CONCLUSION**

17     Congress  basic statutory goal of diminishing sentencing
18 disparity depends for its success upon judicial efforts to
19 determine, and to base punishment upon, the real conduct
20 underlying the crime of conviction.  See U.S. v. Booker, supra.

21     For all of the reasons set forth, Mr. Boobar respectfully
22 requests that he be sentenced to a term no greater than the
23 sentence received by Mr. Hariaczyi and/or the minimum sentence
24 allowed by law.

26 DATED: April 18, 2006               Respectfully submitted,
                                       FLETCHER & FOGDERUDE, INC.

1

                                           /s/ Eric K. Fogderude
                                    Eric K. Fogderude, Attorney for
2                                   Defendant, DANIEL BOOBAR

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28